UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

GARAGE MAINTENANCE, MACHINE
WAREHOUSEMEN, REPAIRMEN, INSIDE
MEN AND HELPERS, AND PLASTIC
EMPLOYEES, LOCAL NO. 974,
AFFILIATED WITH THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,

      Plaintiff,

v.                          **MEMORANDUM OF LAW & ORDER**
                             Civil File No. 11-2333 (MJD/AJB)

GREATER METROPOLITAN AUTOMOBILE
DEALERS ASSOCIATION OF MINNESOTA,
INC., d/b/a Minneapolis Automobile Dealers
Association (MADA), et al.,

      Defendants.

James T. Hansing, Hansing Law Office, Counsel for Plaintiff.

Daniel R. Kelly, Felhaber Larson Fenlon & Vogt, PA, Counsel for Defendants.

## I.    INTRODUCTION

This matter is before the Court on Defendants' Rule 12 Motion to Dismiss

for Failure to State a Claim upon which Relief May Be Granted [Docket No. 7]

1

and on Defendants' Rule 11 Motion for Sanctions Against Plaintiff [Docket No. 16]. The Court heard oral argument on April 6, 2012.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The Parties

Plaintiff the Garage Maintenance, Machine Warehousemen, Repairmen, Inside Men and Helpers and Plastic Employees, Local No. 974, Affiliated with the International Brotherhood of Teamsters (the "Union") and Defendant the Greater Metropolitan Automobile Dealers Association of Minnesota, Inc., d/b/a Minneapolis Automobile Dealers Association ("MADA") were parties to collective bargaining agreements. The Union represents automobile dealership employees, including automotive technicians. (Am. Compl. ¶ III.) Defendants Golden Valley Motors, Inc., Luther Automotive Group, Inc., Motors Management, Inc., and the Luther Company Limited Partnership d/b/a Rudy Luther Toyota/Scion are all Minnesota companies operating an automobile dealership in Golden Valley, Minnesota, and doing business as Rudy Luther Toyota/Scion (collectively "Luther Toyota"), which is a member of MADA and a

party to the relevant collective bargaining agreements.  (Am. Compl. ¶ V; Am. Compl., Ex. D, Agreement.)

### 2. The Collective Bargaining Agreements

The Union, MADA, and Luther Toyota were bound by a collective bargaining agreement effective from April 16, 2006 through April 18, 2009 ("2006 Agreement").  (Am. Compl. ¶ VI; Am. Compl., Ex. A.)  The 2006 Agreement was extended until April 17, 2010.  (Am. Compl. ¶ VII; Am. Compl., Exs. B-C.)  The collective bargaining agreement at issue in this lawsuit is the collective bargaining agreement in effect from April 16, 2010 to April 15, 2013 (the "Agreement").  (Am. Compl. ¶ IX; Am. Compl., Ex. D.)

The Agreement contains a grievance procedure resulting in binding arbitration, which provides, in relevant part:

> Any controversy arising over the interpretation of or adherence to the terms and provisions of this Agreement which cannot be settled between the parties involved shall be settled by the Union and Compliance Committee . . . .  If the controversy cannot be so settled such controversy shall be referred to a Board of Arbitration . . . .  A majority decision of the Board of Arbitration shall be final and binding upon both the Union and the Employer, and such decisions shall be rendered in writing, provided, however, that the Arbitration Board shall have no power to add to or subtract from or modify any of the terms of this Agreement, or any Agreement made supplementary hereto, and provided that no decision of the Board

shall be retroactive beyond the date of the original occurrence of the grievance.

(Agreement § 18.3).

### 3. Underlying Wage Dispute

Luther Toyota's automotive service technicians receive a guaranteed wage rate for all straight time hours worked. (Agreement, §§ 8.1-8.2; Am. Compl., Ex. E, Arbitration Award ("Award") at 4.) They also receive incentive pay based on the accumulated hours in which a technician can perform certain tasks below the time set forth in the manufacturer's or dealer's flat rate manual. (Award at 4.)

Since the mid-1970's, certain MADA members have, at times, provided additional incentives to technicians by granting "credit" beyond the flat rates for the performance of particular tasks, known as above-scale time allowances. (Award at 4.)

Starting in 2001, with Toyota's introduction of the hybrid Toyota Prius, which contained complex electronics and dangerously high voltage levels, Luther Toyota began providing higher time allowances than provided for in the manufacturer's time allowances. (Award at 5.) Luther Toyota unilaterally introduced the hybrid rates, without negotiation with the Union, in part, because it had received technician complaints that the factory allowances were too low.

(Id.)  Luther Toyota was the only MADA member to grant the higher time allowances for hybrid warranty and recall work.  (Id.)

The original 2006 Agreement and the 2009-2010 and the April 15-17, 2010 extensions all provided certain wages per hour produced and also provided:

> If, however, on April 15, 2006 an Employer was paying a higher time allowance to technicians for any operation than the factory flat rate manual allows, that allowance will not be reduced.  The Employer shall not be precluded from reducing any such higher time allowance with respect to those employees that were hired on or after April 16, 2006.

(2006 Agreement § 8.3.)

According to the Award, during the negotiations leading to the 2006 Agreement, MADA spokesperson Stephen Burton met with Union secretary-treasurer Thomas Tweet and proposed eliminating above-scale time allowances, which would have included work performed by Luther Toyota technicians on hybrid vehicles.  The Union rejected the proposal, but the parties did agree to reduce the time allowance for new employees hired on or after April 16, 2006.  (Award at 6.)

According to the Award, at the arbitration hearing, Burton testified that, during the 2006 negotiations, Tweet stated that all a dealer had to do to eliminate an above-scale allowance was to send a letter to the Union announcing the

elimination. (Award at 6, 22.) Tweet denied that he made that statement. (Id. at 12.) However, on cross examination, Tweet could not deny the statements that Burton attributed to him. (Id. at 22.)

The Award concludes that collective bargaining negotiations between MADA and the Union reached a tentative agreement on April 13, 2010. (Award at 19.) "[B]oth sides understood that if the Employer was paying above-scale time allowances on April 15, 2010, then those employees who enjoyed the same would continue to receive them throughout the upcoming contract term." (Id. at 19.)

On April 15, 2010, Luther Toyota delivered a letter to the Union giving notice of Luther Toyota's intention to end the use of above-scale time allowances that day. (Am. Compl. ¶ VIII; Award at 8, 16, 19.) On April 16, 2010, the Union and MADA agreed to the current Agreement. (Am. Compl. ¶ IX.)

The current Agreement, which went into effect on April 16, 2010 (Agreement § 33.1) provides:

ARTICLE VIII

INCENTIVE OPTION

\* \* \*

**Section 8.3.** Incentive Automotive Technicians will be paid on the following basis:

\*\*\*

      If, however, on April 15, 2010, an Employer was paying a higher time allowance to technicians for any operation than the factory flat rate manual allows, that allowance will not be reduced. The Employer shall not be precluded from reducing any such higher time allowance with respect to those employees that were hired on or after April 16, 2006.

\*\*\*

ARTICLE XXVII

MAINTENANCE OF STANDARDS

**Section 27.1.** <u>Protection of Conditions.</u> The Employer agrees that all conditions of employment in his/her individual operation relating to wage guarantee, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest minimum standards in effect at the time of the signing of this Agreement.

    **4.**    **The Grievance**

On April 29, 2010, the Union filed a grievance asserting that Luther Toyota's unilateral elimination of higher time allowances for servicing hybrid vehicles violated § 8.3 and/or § 27.1 of the Agreement. (Am. Compl. ¶ XI; Award at 3, 8-10.) The Union asserted: "The clear and unambiguous language of Article

VIII, Section 8.3 and Article XXVII, Section 27.1 prevent the Employer from eliminating the above-scale time allowance for hybrid vehicles." (Award at 10.)

Luther Toyota argued that it did not violate § 8.3 because "[o]nly those favorable time allowances which exist[ed] as of April 15 must be continued. It follows that if a favorable time allowance was not in existence on April 15, then it did not need [to] be continued." (Id. at 14.) Luther Toyota claimed that, because it had eliminated the above-scale wage rates and time allowances for hybrid vehicles as of April 15, § 8.3 did not require that those rates continue under the new Agreement. (Id.) It further argued that § 27.1 was not violated because that section "does not apply to time allowances. . . . Section 8.3 is the language which specifically controls the enforceability of above-scale time allowances." (Award at 15.)

The parties followed the grievance procedure, waived the Board of Arbitrators, and, on February 8, 2011, submitted the grievance to binding arbitration before Arbitrator Mark W. Suardi ("Arbitrator"). (Award at 3.) The parties both submitted post-hearing briefs. (Id.)

8

### 5. The Arbitration Award

On May 18, 2011, the Arbitrator issued a 26-page award denying the Union's grievance. (Am. Compl., Ex. E, Award.) Although both parties claimed that § 8.3 was clear, the Arbitrator held that § 8.3 was ambiguous in that it "does not preclude either [Luther Toyota's] or the Union's interpretation of the method for eliminating above-scale time allowances or other incentive benefits." (Award at 20.) He found "a latent ambiguity" in the language, which required him to "look to extrinsic evidence in order to find common intent." (Id.)

As to § 27.1, the Arbitrator reasoned:

> With all due respect to the Union, Article XXVII, Section 27.1 does not provide an express, agreed-upon answer to the question presented. As [Luther Toyota] argues, Article XXVII, Section 27.1 only protects conditions in effect "at the time of signing of the agreement" which, by all accounts, took place on April 16, 2010, a day after [Luther Toyota's] issuance of the disputed elimination notice to the Union.

(Award at 21.)

The Arbitrator decided that "the lack of interpretative guidance in the express terms of the Agreement on how above-scale allowances might be terminated places enhanced importance on the parties' bargaining history and day-to-day practices with respect to them." (Id.) He credited Burton's testimony

that Tweet stated that the above-scale incentive could be eliminated by a member dealer's submission of a letter to the Union. (Id. at 22.)

The Arbitrator then concluded that "the record contains at leave five (5) facts which support [Luther Toyota's] position on its ability to eliminate the disputed above-scale time allowances at the end of the previous agreement," including, the "unrebutted" fact that the Union "had 'no problem'" when MADA's bargaining representative informed it, during the 2010 collective bargaining negotiations, of "the prospective termination of above-scale practices as of April 15." (Id. 23-24.) He also noted the instances in which the above-scale allowances had been eliminated by MADA members in the past. (Id. at 23-24.)

The Arbitrator concluded:

> Having read the Agreement in the light of all attendant circumstances presented, including MADA's approach to bargaining in 2006 and 2010, the origin and purposes served by above-scale allowances, and the instances where they were eliminated, the Arbitrator comes away convinced that MADA and the Union agreed that individual allowances could be eliminated in the same way they were introduced, that is, unilaterally, provided that the Union was informed in writing of a given elimination decision prior to the end of an existing contract term, and provided further that elimination did not take effect until the ensuing contract term began. So viewed, the grievance must be denied on the merits.

(Award at 24.)

B.   **Procedural History**

On August 15, 2011, the Union filed a Complaint in this Court against Defendants. [Docket No. 1]  On November 10, 2011, the Union filed an Amended Complaint against the same Defendants.  [Docket No. 2]  The Amended Complaint is "an action for breach of a collective bargaining agreement and for review of an arbitration award brought pursuant to Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185."  (Compl. ¶ I.)  It alleges that the Arbitrator "exceeded his jurisdiction and lacked the power and authority to make the award because he ignored the plain, clear and unmistakable language in the parties' labor agreement," and that the Award "does not derive its essence from the parties' labor agreement."  (Am. Compl. ¶¶ XIII, XIV.)  It further alleges

> That by unilaterally eliminating higher time allowances for automotive technicians working on hybrid vehicles on April 15, 2010, defendants MADA and Luther Toyota have violated, and are violating, plain, clear and unmistakable language in Articles 8 and 27 of the parties' labor agreements [].

(Am. Compl. ¶ XV.)

Defendants now move to dismiss the Complaint for failure to state a claim upon which relief may be granted.

### III. DISCUSSION

#### A. Motion to Dismiss

##### 1. Motion to Dismiss Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true. Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Id. (citations omitted).

In deciding a motion to dismiss, the Court considers "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint." PureChoice, Inc. v. Macke, Civil No. 07-1290, 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)).

### 2.     Standard for Review of an Arbitration Award

Under Section 301 of the Labor Management Relations Act ("LMRA"),

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

"Judicial review of a labor-arbitration award is narrow and deferential. An arbitrator's award must be upheld if it draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice." Breckenridge O'Fallon, Inc. v. Teamsters Union Local No. 682, 664 F.3d 1230, 1233-34 (8th Cir. 2012) (citation omitted). "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." Id. at 1234 (citation omitted). The Court "will only vacate an award if the arbitrator ignored or disregarded the plain language of an unambiguous contract or nullified a provision of the contract." Star Tribune Co. v. Minn. Newspaper Guild Typographical Union, 450 F.3d 345, 348 (8th Cir. 2006) (citations omitted). "[F]ederal courts are not authorized to reconsider the

merits of an arbitral award, even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Boise Cascade Corp. v. Paper Allied-Indus., Chem. & Energy Workers (PACE), Local 7-0159, 309 F.3d 1075, 1080 (8th Cir. 2002) (citations omitted).

> [A]lthough the arbitrator's authority is broad, it is not unlimited. In addition to those grounds for vacation of an award set forth in the Federal Arbitration Act, 9 U.S.C. § 10 (2000) (listing such reasons as the arbitrator's corruption, fraud, evident partiality, misconduct, or ultra vires acts), courts have vacated arbitral awards that are completely irrational or that evidence[ ] a manifest disregard for the law. An award is irrational where it fails to draw its essence from the agreement; it manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it. An arbitrator's award draws its essence from the [parties' agreement] as long as it is derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention.

Id. (citations omitted).

### 3. Whether the Arbitrator's Award Draws Its Essence from the Agreement

Here, the Award demonstrates that the Arbitrator did consider the sections of the Agreement considered pertinent by the Union: §§ 8.3 and 27.1. Because the Arbitrator concluded that the relevant provisions were ambiguous as applied to the grievance, the Arbitrator also considered extrinsic evidence.

> [T]he arbitrator is not free to alter or amend the parties' agreement, unless expressly authorized to do so. Thus, where the plain text of the agreement is unmistakably clear, it is presumed to evince the parties' intent, and the arbitrator normally need look no further, but must give effect to the parties' agreement as written.

Boise Cascade Corp., 309 F.3d at 1082 (footnote omitted). "On the other hand, where the plain language of the parties' agreement is silent or ambiguous with respect to a disputed issue, an arbitrator is obliged to consider other relevant sources of the parties' intent." Id. (citation omitted). "Thus . . . federal courts routinely confirm arbitral awards where the arbitrator has looked to outside sources for guidance in giving meaning to ambiguous language." Id. at 1083 (citations omitted). "Conversely, . . .[courts] have vacated awards where the arbitrator failed to consider such sources when to do so was vital to determine the parties' intent." Id. (citations omitted).

In this case, the Arbitrator was warranted in finding that the plain language of the Agreement was silent or ambiguous with respect to the disputed issue – how the above-scale time allowance could be legitimately terminated, and, thus, whether the above-scale time allowance was being paid on April 15, 2010. Article 8 of the Agreement, requiring the employer to maintain any higher-time allowance it "was paying" "on April 15, 2010," did not resolve the dispute

15

because it does not provide whether or not the higher time allowance was legitimately eliminated on April 15. Similarly, Article 27, which required the employer to maintain "all conditions of employment . . . relating to wage guarantee, hours of work, overtime differentials and general working conditions . . . in effect at the time of the signing of this agreement," which was April 16, 2010, does not resolve the dispute because it does not address whether the higher time allowance was legitimately eliminated the day before, on April 15. The Arbitrator's decision that the Agreement contained a "latent ambiguity" because it did not address how Luther Toyota was permitted to discontinue the payments was supported by the Agreement. Therefore, the Arbitrator was justified in looking at extrinsic evidence to ascertain the parties' intent.

However, the Union asserts that the Arbitrator's decision does not represent a full and fair recitation of the all the evidence that was before him, so it cannot fully brief the issue of whether the Arbitrator's ruling drew its essence from the Agreement without evidence that is outside the pleadings. It seeks to rely on a complete record of the arbitration proceedings, including the transcript of the arbitration hearing and arbitration exhibits, to support its assertion that the Arbitrator's Award fails to draw its essence from the Agreement. In order to

determine if the Arbitrator's award drew its essence from the Agreement, the Court must evaluate whether "the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intention." McGrann v. First Albany Corp., 424 F.3d 743, 749 (8th Cir. 2005). Without access to the record that was before the Arbitrator, the Court cannot evaluate the Union's argument that the Award did not derive from the Agreement, "context," and "other indications of the parties' intention." Therefore, the Court denies the motion to dismiss as premature at this time.

The Court notes, however, that its denial is not an indication that this matter should proceed to full-scale discovery, as in a typical civil case. See, e.g., Frere v. Orthofix, Inc., No. 99CIV.4049(RMB)(MHD), 00CIV.1968 (RMB)(MHD), 2000 WL 1789641, at *4 (S.D.N.Y. Dec. 6, 2000) ("[D]iscovery in a post-arbitration judicial proceeding to confirm or vacate is governed by the Federal Rules of Civil Procedure, but is available only in limited circumstances, where relevant and necessary to the determination of an issue raised by such an application."). The Court simply holds that it is currently unable to issue an informed decision on the pending motion to dismiss when the parties dispute the facts that were before the Arbitrator, but do not present the Court with the relevant record or

fully brief the issue of which facts were allegedly misrepresented in the Award and how they would support vacating the Award.

### B. Rule 11 Motion

Defendants have also filed a motion for sanctions under Federal Rule of Civil Procedure 11. As the Court has explained, at this stage of the litigation, the Court cannot conclude that Plaintiff's Amended Complaint is frivolous, not warranted by existing law, or lacking in a factual basis. Defendants' Rule 11 Motion for Sanctions is denied.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1. Defendants' Rule 12 Motion to Dismiss for Failure to State a Claim upon which Relief May Be Granted [Docket No. 7] is **DENIED WITHOUT PREJUDICE**.

2. Defendants' Rule 11 Motion for Sanctions Against Plaintiff [Docket No. 16] is **DENIED**.

Dated: May 10, 2012         s/ Michael J. Davis
                            Michael J. Davis
                            Chief Judge
                            United States District Court