**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

GARAGE MAINTENANCE, MACHINE
WAREHOUSEMEN, REPAIRMEN, INSIDE
MEN AND HELPERS, AND PLASTIC
EMPLOYEES, LOCAL NO. 974,
AFFILIATED WITH THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,

        Plaintiff,


v.                          **MEMORANDUM OF LAW & ORDER**
                                Civil File No. 11-2333 (MJD/AJB)

GREATER METROPOLITAN AUTOMOBILE
DEALERS ASSOCIATION OF MINNESOTA,
INC., d/b/a Minneapolis Automobile Dealers
Association (MADA), et al.,

        Defendants.

---

James T. Hansing, Hansing Law Office, Counsel for Plaintiff.

Daniel R. Kelly and Jessica M. Marsh, Felhaber Larson Fenlon & Vogt, PA,
Counsel for Defendants.

---

## I.  INTRODUCTION

      This matter is before the Court on Defendants' Renewed Rule 12 Motion to

Dismiss for Failure to State a Claim upon which Relief May Be Granted, or, in the

Alternative, Rule 56 Motion for Summary Judgment [Docket No. 39].  The Court

1

heard oral argument on December 21, 2012.  With the full record now before the Court, the Court grants Defendants' motion to dismiss.

## II.      BACKGROUND

### A.      Factual Background

#### 1.      The Parties

Plaintiff the Garage Maintenance, Machine Warehousemen, Repairmen, Inside Men and Helpers and Plastic Employees, Local No. 974, Affiliated with the International Brotherhood of Teamsters (the "Union") and Defendant the Greater Metropolitan Automobile Dealers Association of Minnesota, Inc., d/b/a Minneapolis Automobile Dealers Association ("MADA") were parties to collective bargaining agreements.  The Union represents automobile dealership employees, including automotive technicians.  Defendants Golden Valley Motors, Inc., Luther Automotive Group, Inc., Motors Management, Inc., and the Luther Company Limited Partnership d/b/a Rudy Luther Toyota/Scion are all Minnesota companies operating an automobile dealership in Golden Valley, Minnesota, and doing business as Rudy Luther Toyota/Scion (collectively "Luther Toyota"), which is a member of MADA and a party to the relevant collective bargaining agreements.

## 2.     The Collective Bargaining Agreements

The Union, MADA, and Luther Toyota were bound by a collective

bargaining agreement effective from April 16, 2006 through April 15, 2009 ("2006

Agreement").  (Am. Compl., Ex. A.)  The 2006 Agreement was extended until

April 17, 2010.  (Am. Compl., Exs. B-C.)  The collective bargaining agreement at

issue in this lawsuit is the collective bargaining agreement in effect from April

16, 2010 to April 15, 2013 (the "Agreement").  (Am. Compl., Ex. D.)

The Agreement contains a grievance procedure resulting in binding

arbitration, which provides, in relevant part:

> Any controversy arising over the interpretation of or adherence to
> the terms and provisions of this Agreement which cannot be settled
> between the parties involved shall be settled by the Union and
> Compliance Committee . . . .  If the controversy cannot be so settled
> such controversy shall be referred to a Board of Arbitration . . . .  A
> majority decision of the Board of Arbitration shall be final and
> binding upon both the Union and the Employer, and such decisions
> shall be rendered in writing, provided, however, that the Arbitration
> Board shall have no power to add to or subtract from or modify any
> of the terms of this Agreement, or any Agreement made
> supplementary hereto, and provided that no decision of the Board
> shall be retroactive beyond the date of the original occurrence of the
> grievance.

(Agreement § 18.3.)

### 3.    Underlying Wage Dispute

Luther Toyota's automotive service technicians receive a guaranteed wage rate for all straight time hours worked.  (Agreement, §§ 8.1-8.2; Am. Compl., Ex. E, Arbitration Award ("Award") at 4.)  They also receive incentive pay based on the accumulated hours in which a technician can perform certain tasks below the time set forth in the manufacturer's or dealer's flat rate manual.  (Agreement § 8.3; Award at 4.)  Since the mid-1970's, certain MADA members have, at times, provided additional incentives to technicians by granting "credit" beyond the flat rates for the performance of particular tasks, known as above-scale time allowances.  (Award at 4.)

Starting in 2001, with Toyota's introduction of the hybrid Toyota Prius, which contained complex electronics and dangerously high voltage levels, Luther Toyota began providing higher time allowances than provided for in the manufacturer's time allowances.  (Award at 5.)  Luther Toyota unilaterally introduced the hybrid rates, without negotiation with the Union, in part, because it had received technician complaints that the factory allowances were too low.  (Id.)  Luther Toyota was the only MADA member to grant the higher time allowances for hybrid warranty and recall work.  (Id.)

The original 2006 Agreement provided certain wages per hour produced and also provided:

> If, however, on April 15, 2006 an Employer was paying a higher time allowance to technicians for any operation than the factory flat rate manual allows, that allowance will not be reduced. The Employer shall not be precluded from reducing any such higher time allowance with respect to those employees that were hired on or after April 16, 2006.

(2006 Agreement § 8.3.)

According to the Award, during the negotiations leading to the 2006 Agreement, MADA spokesperson Stephen Burton met with Union secretary-treasurer Thomas Tweet and proposed eliminating above-scale time allowances, which would have included work performed by Luther Toyota technicians on hybrid vehicles. The Union rejected the proposal, but the parties did agree to reduce the time allowance for new employees hired on or after April 16, 2006. (Award at 6.)

At the arbitration hearing, Burton testified that, during the 2006 negotiations, Tweet stated that all a dealer had to do to eliminate an above-scale allowance was to send a letter to the Union announcing the elimination. (Award at 6, 22.) Tweet initially denied that he made that statement. (<u>Id.</u> at 12.)

However, on cross examination, Tweet could not deny the statements that Burton attributed to him.  (Id. at 22.)

In 2010, the parties were negotiating the new Agreement.  The Award credits the testimony of Burton that, in February or March of 2010, Burton asked Tweet if it was okay for dealers to eliminate above-scale time allowances on April 15, 2010, even if the parties agreed to extend the 2006 Agreement to April 17, 2010, and Tweet said that he had no problem with that course of action. (Award at 24; Transcript 176-77.)

The Award concludes that collective bargaining negotiations between MADA and the Union reached a tentative agreement on April 13, 2010.  (Award at 19.)  "[B]oth sides understood that if the Employer was paying above-scale time allowances on April 15, 2010, then those employees who enjoyed the same would continue to receive them throughout the upcoming contract term."  (Id.)

A "Tentative Contract Agreement Between the Minneapolis Automobile Dealers' Association and Teamsters Local No. 974" was drawn up, and the Union forwarded it to its members for ratification on April 15.  (Union Arb. Ex. 14.)  The Union notes that this document did not mention the above-scale time allowance. Also, under "Article VII – Incentive Option, Section 3" was the following

provision: "The parties have agreed to update the current language, to provide that if the employer was paying a higher time allowance than the factory flat rate manual allows as of April 15, 2010, that allowance will not be reduced." (Id. at 3.) The Union ratified the current Agreement on April 16. (Transcript 46; Union Ex. 15; Am. Compl. ¶ IX.)

On April 15, 2010, Luther Toyota delivered a letter to the Union giving notice of Luther Toyota's intention to end the use of above-scale time allowances that day. (Am. Compl. ¶ VIII; Award at 8, 19.)

The current Agreement, which went into effect on April 16, 2010 (Agreement § 33.1) provides:

ARTICLE VIII

INCENTIVE OPTION

* * *

**Section 8.3.** Incentive Automotive Technicians will be paid on the following basis:

* * *

If, however, on April 15, 2010, an Employer was paying a higher time allowance to technicians for any operation than the factory flat rate manual allows, that allowance will not be reduced. The Employer shall not be precluded from reducing any such higher

time allowance with respect to those employees that were hired on or after April 16, 2006.

\* \* \*

ARTICLE XXVII

MAINTENANCE OF STANDARDS

**Section 27.1.** <u>Protection of Conditions.</u> The Employer agrees that all conditions of employment in his/her individual operation relating to wage guarantee, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest minimum standards in effect at the time of the signing of this Agreement.

### 4.     **The Grievance**

On April 29, 2010, the Union filed a grievance asserting that Luther

Toyota's unilateral elimination of higher time allowances for servicing hybrid

vehicles violated § 8.3 and/or § 27.1 of the Agreement.  (Am. Compl. ¶ XI; Award

at 3, 8-10.)  The Union asserted: "The clear and unambiguous language of Article

VIII, Section 8.3 and Article XXVII, Section 27.1 prevent the Employer from

eliminating the above-scale time allowance for hybrid vehicles."  (Award at 10.)

Luther Toyota argued that it did not violate § 8.3 because "[o]nly those

favorable time allowances which exist[ed] as of April 15 must be continued.  It

follows that if a favorable time allowance was not in existence on April 15, then it

did not need [to] be continued."  (<u>Id.</u> at 14.)  Luther Toyota claimed that, because

it had eliminated the above-scale wage rates and time allowances for hybrid vehicles as of April 15, § 8.3 did not require that those rates continue under the new Agreement.  (Id.)  It further argued that § 27.1 was not violated because that section "does not apply to time allowances. . . .  Section 8.3 is the language which specifically controls the enforceability of above-scale time allowances."  (Award at 15.)

The parties followed the grievance procedure, waived the Board of Arbitrators, and, on February 8, 2011, submitted the grievance to binding arbitration before Arbitrator Mark W. Suardi ("Arbitrator").  (Award at 3.)  The parties both submitted post-hearing briefs.  (Id.)

### 5.      The Arbitration Award

On May 18, 2011, the Arbitrator issued a 26-page award denying the Union's grievance.  (Am. Compl., Ex. E, Award.)  Although both parties claimed that § 8.3 was clear, the Arbitrator held that § 8.3 was ambiguous in that it "does not preclude either [Luther Toyota's] or the Union's interpretation of the method for eliminating above-scale time allowances or other incentive benefits."  (Award at 20.)  He found "a latent ambiguity" in the language, which required him to "look to extrinsic evidence in order to find common intent."  (Id.)

As to § 27.1, the Arbitrator reasoned:

> With all due respect to the Union, Article XXVII, Section 27.1 does not provide an express, agreed-upon answer to the question presented. As [Luther Toyota] argues, Article XXVII, Section 27.1 only protects conditions in effect "at the time of <u>signing</u> of the agreement" which, by all accounts, took place on April 16, 2010, a day after [Luther Toyota's] issuance of the disputed elimination notice to the Union.

(Award at 21.)

The Arbitrator decided that "the lack of interpretative guidance in the express terms of the Agreement on how above-scale allowances might be terminated places enhanced importance on the parties' bargaining history and day-to-day practices with respect to them."  (<u>Id.</u>)  He credited Burton's testimony that Tweet stated that the above-scale incentive could be eliminated by a member dealer's submission of a letter to the Union.  (<u>Id.</u> at 22.)

Burton testified:

> A [Burton]: **** At some point during the [2006] negotiations, Tom Tweet on behalf of [the Union] offered a counterproposal, and his counterproposal, in my view, consisted of two specific points.
>
> The first was he was willing to say that people hired on or after April 16th of that contract year would not be the beneficiary of Article VIII, Section 3.  In other words, as to those folks we could reduce time allowances and we could assign work to those folks, in fact, in preference to people who had been hired prior to April 16th.

In addition to that, he described to me a process that dealers could employ in terminating above-scale time allowances. And he referenced some instances at a dealership that, frankly, I was completely unaware of that that had been happening.

What Tom said was that Win Stevens Buick, a dealership which is no longer in existence, that they would routinely send a letter to [the Union] prior to contract expiration putting the union on notice that it was the dealer's intention to eliminate those above-scale time allowances, and that going forward they would no longer exist.

Q: In outlining this procedure that had been in place did he indicate that there were any limitations relating to the procedure?

A: No.

Q: And what was [MADA's] response to Mr. Tweet's proposal and explanation?

A: Our response to Mr. Tweet's counterproposal was to accept it, because we felt that the elimination of that preservation of above-scale time allowance provision relative to people hired after April 16th was workable. We could assign that work to people who were hired after that date and not be hamstrung by historical practice.

And, in addition to that, my reaction, which was the reaction of [MADA] as to the procedure for terminating that time that [sic] allowance, was that that was an acceptable method of handling the issue on a store-by-store basis which would not require it to be brought up in negotiations forevermore.

Q: And when Mr. Tweet explained this methodology for ending dealer-specific above-time – above-scale time allowances, did he make those statements in front of your labor committee?

A: He did.

(Transcript 162-63.)

The Arbitrator noted that when Tweet was cross examined, he testified

that he could not state that Burton's claim was untrue. (Award at 22.)

Specifically, Tweet testified:

> Q: Let me ask you this question very straightforward: Didn't you
> during the 2006 negotiations tell Steve Burton that if the employers
> wanted to end an above-scale wage rate, what they needed to do
> was follow the process that Win Stephens had followed and send a
> letter indicating they wanted to end it?
>
> A [Tweet]: I, I can't answer exactly if I said that or not.
>
> But he's talking Win Stephens. I, I suspect I may have said
> something similar.
>
> Q: All right. So if Mr. Burton testifies here today that you told him
> that if the dealer wanted to end an above-scale wage rate that what
> you do is send a letter, you're not going to claim that Mr. Burton is
> testifying falsely, are you.
>
> A: No.

(Transcript at 67-68.)

The Arbitrator then concluded that "the record contains at leave five (5)

facts which support [Luther Toyota's] position on its ability to eliminate the

disputed above-scale time allowances at the end of the previous agreement,"

including, the "unrebutted" fact that the Union "had 'no problem'" when MADA's bargaining representative informed it, during the 2010 collective bargaining negotiations, of "the prospective termination of above-scale practices as of April 15." (Id. 23-24.)

The Arbitrator also noted the instances in which the above-scale allowances had been eliminated by MADA members in the past. (Award at 23-24.)

The Arbitrator concluded:

> Having read the Agreement in the light of all attendant circumstances presented, including MADA's approach to bargaining in 2006 and 2010, the origin and purposes served by above-scale allowances, and the instances where they were eliminated, the Arbitrator comes away convinced that MADA and the Union agreed that individual allowances could be eliminated in the same way they were introduced, that is, unilaterally, provided that the Union was informed in writing of a given elimination decision prior to the end of an existing contract term, and provided further that elimination did not take effect until the ensuing contract term began. So viewed, the grievance must be denied on the merits.

(Award at 24.)

## B.    Procedural History

On August 15, 2011, the Union filed a Complaint in this Court against Defendants. [Docket No. 1] On November 10, 2011, the Union filed an Amended Complaint against the same Defendants. [Docket No. 2] The Amended

Complaint is "an action for breach of a collective bargaining agreement and for review of an arbitration award brought pursuant to Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185." (Am. Compl. ¶ I.) It alleges that the Arbitrator "exceeded his jurisdiction and lacked the power and authority to make the award because he ignored the plain, clear and unmistakable language in the parties' labor agreement," and that the Award "does not derive its essence from the parties' labor agreement." (Am. Compl. ¶¶ XIII, XIV.) It further alleges

> That by unilaterally eliminating higher time allowances for automotive technicians working on hybrid vehicles on April 15, 2010, defendants MADA and Luther Toyota have violated, and are violating, plain, clear and unmistakable language in Articles 8 and 27 of the parties' labor agreements [].

(Am. Compl. ¶ XV.)

In December 2011, Defendants moved to dismiss the Complaint for failure to state a claim upon which relief may be granted. In January 2012, they moved for Rule 11 sanctions. On May 11, 2012, this Court denied the motion for sanctions and denied, without prejudice, the motion to dismiss. In its May 2012 Order, this Court held that the Arbitration Award demonstrated "that the Arbitrator did consider the sections of the Agreement considered pertinent by

the Union: §§ 8.3 and 27.1." (May 2012 Order at 14.) The Court further held that

"the Arbitrator was warranted in finding that the plain language of the

Agreement was silent or ambiguous with respect to the disputed issue – how the

above-scale time allowance could be legitimately terminated, and, thus, whether

the above-scale time allowance was being paid on April 15, 2010." (Id. at 15.)

Finally, the Court held: "The Arbitrator's decision that the Agreement contained

a 'latent ambiguity' because it did not address how Luther Toyota was permitted

to discontinue the payments was supported by the Agreement. Therefore, the

Arbitrator was justified in looking at extrinsic evidence to ascertain the parties'

intent." (Id. at 16.)

However, the Court denied the motion to dismiss because the Union

asserted "that the Arbitrator's decision does not represent a full and fair

recitation of the all the evidence that was before him." (Id. at 16.)

> Without access to the record that was before the Arbitrator, the
> Court cannot evaluate the Union's argument that the Award did not
> derive from the Agreement, "context," and "other indications of the
> parties' intention." Therefore, the Court denies the motion to
> dismiss as premature at this time.

(Id. at 17.)

The entire arbitration record is now before the Court, and Defendants again move for dismissal.

## III.  DISCUSSION

### A.  Motion to Dismiss Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true.  <u>Zutz v. Nelson</u>, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

<u>Id.</u> (citations omitted).

In deciding a motion to dismiss, the Court considers "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint."  <u>PureChoice, Inc. v. Macke</u>, Civil No. 07-1290, 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999)).   Because Plaintiff attached the

Award to its Complaint, the complete record of the Arbitration is embraced by

the Complaint.  (However, even if the Court were to consider the motion before

it as a summary judgment motion, the resulting reasoning and decision would be

the same.)

###### B.	Standard for Review of an Arbitration Award

Under Section 301 of the Labor Management Relations Act ("LMRA"),

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

"Judicial review of a labor-arbitration award is narrow and deferential.

An arbitrator's award must be upheld if it draws its essence from the collective

bargaining agreement, and is not merely his own brand of industrial justice."

Breckenridge O'Fallon, Inc. v. Teamsters Union Local No. 682, 664 F.3d 1230,

1233-34 (8th Cir. 2012) (citation omitted).  "[I]f an arbitrator is even arguably

construing or applying the contract and acting within the scope of his authority,

the fact that a court is convinced he committed serious error does not suffice to

overturn his decision."  Id. at 1234 (citation omitted).  The Court "will only

vacate an award if the arbitrator ignored or disregarded the plain language of an unambiguous contract or nullified a provision of the contract." <u>Star Tribune Co. v. Minn. Newspaper Guild Typographical Union</u>, 450 F.3d 345, 348 (8th Cir. 2006) (citations omitted). "[F]ederal courts are not authorized to reconsider the merits of an arbitral award, even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." <u>Boise Cascade Corp. v. Paper Allied-Indus., Chem. & Energy Workers (PACE), Local 7-0159</u>, 309 F.3d 1075, 1080 (8th Cir. 2002) (citations omitted).

> [A]lthough the arbitrator's authority is broad, it is not unlimited. In addition to those grounds for vacation of an award set forth in the Federal Arbitration Act, 9 U.S.C. § 10 (2000) (listing such reasons as the arbitrator's corruption, fraud, evident partiality, misconduct, or ultra vires acts), courts have vacated arbitral awards that are completely irrational or that evidence[ ] a manifest disregard for the law. An award is irrational where it fails to draw its essence from the agreement; it manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it. An arbitrator's award draws its essence from the [parties' agreement] as long as it is derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention.

<u>Id.</u> (citations omitted).

### C.     Ambiguity of the Agreement

The Court rejects the Union's argument that § 8.3 is unambiguous and, therefore, the Arbitrator erred in reviewing parol evidence. The Court already

addressed this same argument in its May 2012 Order and held that the Arbitrator

was justified in finding a latent ambiguity and in examining extrinsic evidence.

Plaintiff has not shown that the Court's decision was erroneous.

> **D.** **Article 33 and Section 25.2**

Next, the Court rejects the Union's argument that Article 33 and Section

25.2 unambiguously provide that Luther Toyota violated the Agreement by

terminating the above-scale allowance. The Union has waived its new argument

that Article 33 and Section 25.2 apply because the Union never raised that

argument to the Arbitrator. Int'l Bhd. of Elec. Workers, Local Union No. 545 v.

Hope Elec. Corp., 380 F.3d 1084, 1101 (8th Cir. 2004) (citation omitted). Nor did

the Union raise these sections in its pleadings to this Court or in its response to

the first motion to dismiss. Even if the Court reaches the merits of the argument,

the Court holds that these sections do not justify vacating the Award. Article 33

generally addresses auto-renewal of the entire collective bargaining agreement,

but does not address how above-scale allowances are terminated. Section 25.2

only addresses the possible effects of the Patient Protection and Affordable Care

Act of 2010; it has no relation to above-scale allowances.

> **E.** **Whether the Arbitrator Considered the Parties' Interpretation of the Agreement**

It is apparent from the text of the Award that the Arbitrator did consider both parties' interpretation of the Agreement. He summarized both arguments and acknowledged that both sides claimed that the Agreement was unambiguous – albeit with opposite interpretations. However, he determined that he could not accept either argument and, instead, found the Agreement to be ambiguous, a finding that this Court already held to be supported in its May 2012 Order. The Arbitrator collected substantial evidence regarding past practices from the parties. While the Union does not agree with the Arbitrator's decision and reasoning, it cannot be said that the Arbitrator failed to address the Union's position.

## F.  Whether Defendants Violated the National Labor Relations Act ("NLRA")

The Court rejects the Union's claim that the Award must be vacated because Defendants violated the NLRA by refusing to bargain on the issue of above-scale allowances. The Arbitrator did address the Union's NLRA claim, and the NLRB also deferred to the Arbitrator on that point. There is no indication that the Arbitrator erred. There is no appeal of the NLRB decision before this Court.

## G.  Whether the Arbitrator Considered the Relevant Context

The Court holds that the Arbitrator properly considered the full context in which the parties' agreement was negotiated and renewed in 2006 and 2010. The Arbitrator acknowledged evidence highlighted by the Union, such as the above-scale payments to two technicians after April 15, 2010, but credited Defendants' position that the payments were made in error. Although the Union sets forth a cogent argument that, if other important negotiated items were put into writing, then an agreement on how to eliminate the above-scale allowances would also have been put in writing, that reasoning is insufficient to justify vacating the Award. A different interpretation of the facts surrounding the parties' interactions is within the Arbitrator's discretion. Credibility determinations are explicitly within an arbitrator's discretion and, here, the Arbitrator found Burton's testimony regarding the oral agreement to be credible.

**H.** **Whether the Record Supports the Five Facts**

The Union argues that there is no evidentiary support for the five facts upon which the Arbitrator relied to support the existence of a 2006 oral agreement. The Court concludes that the Arbitrator's recitation of the five facts does not provide a basis upon which to vacate the Award. The five facts were listed to bolster the main evidence – the Arbitrator's reliance upon Burton's testimony that the oral agreement existed and Tweet's testimony that he could

not deny that he agreed to this oral agreement with Burton.  The Arbitrator is permitted to make that credibility determination.  In any event, the record provides support for each of the five facts found by the Arbitrator.

1.      **Fact #1: The 2006 Elimination of Above-Scale Allowances by Village Automotive Group**

The Award states: "First, there is uncontested elimination of above-scale incentives by Village Automotive Group in 2006."  (Award at 23.)  The Arbitration record includes correspondence that purports to announce the elimination.  Additionally, Tweet's testimony on the import of the letter is ambiguous.  He testified that the Union viewed it as an "informational letter" and that Tweet "would not view this as being binding to the union."  (Transcript 64.)  However, he also testified that he was "sure in the position of the employer" that this is "a letter intend[ing] to cease paying guaranteed incentive wage rate," that the letter was not grieved by the Union, and that the Union did not "write any letter or respond to this in any fashion that would indicate [the Union] w[as] objecting to this."  (Id. 65.)  Tweet also testified that he "d[idn't] know if they [Village Automotive] ended it [the above-scale wage rate] or not," he simply "d[idn't] know one way or another."  (Id. 93.)  Tweet confirmed that Village Automotive did not bargain with the Union about discontinuing the above-scale

22

wages. (Id.) The Arbitration record also contains testimony that he received the

letter. (Id. 63-64.) The record provides support for the Arbitrator's finding.

### 2. Fact #2: Key Cadillac's 2009 Elimination Was Met with a Protest Based Solely on Timeliness

The Award states:

> Secondly, while Key Cadillac's 2009 attempt to eliminate allowances
> was met with opposition by the Union, Key's subsequent 2010
> elimination took place without complaint and in the manner
> described by Mr. Burton. Here, the Arbitrator finds it is noteworthy
> that Secretary/Treasurer Tweet's 2009 protest letter stated that the
> proposed elimination was 'not timely,' with no mention that the
> allowances were to continue indefinitely, as he testified.

(Award at 23.)

The record contains the 2010 notice of termination letter from Key to the

Union, Tweet's 2009 protest letter, and Burton's testimony (Transcript 169-73).

Additionally, the Union acknowledges that the Arbitrator was correct in stating

that "Key's subsequent 2010 elimination [of the above-scale allowance] took

place without Complaint." (Union Opposition Brief at 22.) The Arbitrator's fact-

finding was supported by the record.

### 3. Fact #3: Key Cadillac's Elimination Was Met with No Union Complaint

The Award provides:

Third, following Key Cadillac's elimination of incentive allowances and other benefits in April 2010, the Union made no claim protesting their elimination, requesting bargaining or asserting that the eliminated benefits had become engrafted onto the parties' overall relationship.

(Award at 23.)

Defendants point out that the Union does not contest that, after Key Cadillac's elimination of incentive allowances and other benefits in April 2010, the Union made no claim protesting the elimination, requesting bargaining, or asserting that the eliminated benefits had become engrafted onto the parties' overall relationship. (<u>See</u> Transcript 173-74 (Q: And other than the grievance that we're here for today, has Mr. Tweet or the union ever objected to the use of that procedure? A [Burton]: No.").) Although Tweet did testify, "I believe that letter was about uniforms, not over scale," he also admitted that he "d[idn't] know one way or the other" whether the dealers had eliminated above-scale allowances. (Transcript 92, 94.) The record provides support for the Arbitrator's finding.

### 4.	Fact #4: Payroll Error

The Award provides:

Fourth, despite the Union's reliance on the fact that a couple of the Employer's service technicians received above-scale wages post-Agreement, such payments were the result of ongoing reporting of above-scale times by the technicians themselves. They were paid in

error and inadvertently made despite the Employer's effort to ferret
them out.  As such, the payments do not ascribe the telling weight
which the Union ascribes to them.

(Award at 23-24.)

Luther Toyota's John Kendall testified that, on April 15 and 16, 18 service

technicians attempted to claim above-scale pay and he reduced that to regular

pay in 16 cases, but missed 2 service technicians by accident.  (Transcript 220-31.)

The record also contains a report of technician payroll sheets.  The record

provides support for the Arbitrator's finding.

### 5.    Fact #5: Whether Tweet Stated that He Had "No Problem"

The Award provides:

Fifth, and perhaps most importantly, the record is clear that Messrs.
Burton and Tweet discussed the manner of eliminating above-scale
allowances in light of the need to extend the then existing agreement
from April 15, 2010, to April 17, 2010.  Crediting Mr. Burton, a
specific discussion was held on the prospective termination of
above-scale practices as of April 15, even though the agreement was
to be extended for two (2) more days.  The fact that Mr. Tweet had
'no problem' with the arrangement is an important fact which
stands unrebutted on the record.

(Award at 24.)

Burton testified as follows:

Way back before negotiations actually commenced, Tom Tweet
made a very good suggestion. Our contract expired the end of April

25

15; that was a Thursday. Tom indicated that he would be agreeable to extending the agreement through that following Saturday, which would have been April 17th. That way in case there was a possibility of the members not ratifying a tentative agreement, dealers would not face the prospect of having a strike on a Friday, which would disappoint a lot of customers. Because of that, we agreed to a contract extension agreement that carried the contract through April 17th.

At some point in February or March [of 2010], it occurred to me that if we use this practice of having people send a letter that says I'm terminating my above-scale time allowances as of April 15th and I'm not paying them any more, you have a technical violation of the extended collective bargaining agreement insofar as April 15, 16, and 17 are concerned. And I don't like, like my great legal advice, walking people into a meritorious grievance.

For that reason, I talked during a negotiating session, I believe in February or March, at the Residence Inn out in Edina where negotiations were held, I mentioned the issue to Tom that he had been gracious enough to extend the agreement through April 17th. **I told him that I have this issue of a couple people who want to eliminate some above-scale time allowances**, and the date in the contract will absolutely predictably be April 15th that that keys in on, and **is it okay if we do it that way, terminate those practices as of April 15, even though the agreement was extended to the 17th. And he had no problem with that whatsoever he was agreeable.**

(Transcript 176-77 (emphasis added).)

Burton's testimony supports the Arbitrator's finding.

Overall, there is evidence in the record to support the Arbitrator's statement of each of the five facts – testimony and documentary evidence

provides support for claims that Tweet agreed to elimination of above-scale

benefits on April 15, 2010, even though the 2006 Agreement was extended, that

other car dealerships had utilized similar letters to end above-scale allowances,

that the Union did not protest Key Cadillac's decision to do so, and that the

above-scale pay to 2 out of the 18 technicians claiming it on April 15 and 16, 2010,

was an inadvertent error.  Whether the Court agrees with the Arbitrator is not

relevant, because the Supreme Court has directed that even "serious error" in

factfinding or "silly" factfinding does not justify vacating an award.  Major

League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509-10 (2001).  See also

United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987)

("[A]n arbitrator must find facts and a court may not reject those findings simply

because it disagrees with them.").  In this case, whether or not the Arbitrator's

interpretation of the evidence and credibility determinations were the most

reasonable, they were based on the record before him and there is support for

each factual conclusion.

Overall, the Arbitrator acted within his jurisdiction and authority, and the

Award derives its essence from the collective bargaining agreements.  The

Arbitrator's findings are supported by the record that was before him.  There is

no basis for vacating the Award.  Finally, the Court denies Defendants' request

for an award of attorney's fees because there is no basis provided for such an

award.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

Defendants' Renewed Rule 12 Motion to Dismiss for Failure to State
a Claim upon which Relief May Be Granted, or, in the Alternative,
Rule 56 Motion for Summary Judgment [Docket No. 39] is
**GRANTED** and this matter is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   February 11, 2013          s/ Michael J. Davis_____
                                    Michael J. Davis
                                    Chief Judge
                                    United States District Court